IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

| UNITED STATES OF AMERICA, | ) | CR 12-10-BU-DLC |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | ORDER |
| XIAO MENG MA and LAN LUO, | ) | |
| Defendants. | ) | |

Defendants Xiao Meng Ma and Lan Luo have filed a motion to suppress the marijuana discovered and seized during a traffic stop of their vehicle. (Docs. 32, 39.) The marijuana will not be suppressed because, although Defendant Luo's consent to search was not voluntary, the search of Defendants' vehicle was nonetheless permitted under the automobile exception to the Fourth Amendment.

## I. Facts

Defendants were driving from Washington to New York on June 16, 2012, when Montana Highway Patrol Trooper Amundson ("Amundson") stopped them

on the interstate highway near Bozeman, Montana. Defendant Luo rented a minivan in Washington that morning with Defendant Ma listed as an authorized driver. Defendant Ma took the van somewhere briefly by herself before both Defendants set out for New York. Ma was driving when they were stopped at 11:28 p.m. that night for speeding 51 mph in a 35 mph construction zone on I-90 near mile marker 308 in Bozeman. Both Defendants provided Amundson with California driver's licenses, and both are legal aliens from China. Ma speaks some English and has lived in the United States since 2005, but Luo speaks very little English and has lived in the United States less than two years.

As he approached the passenger side of the van, Amundson noticed the rear seats were removed and six large duffel bags were on the floor of the van. The bags appeared full and evenly loaded, and were of varying shapes. He also saw a small pink suitcase, a small blue bag, and a small white bag behind the front seats of the van. Amundson asked Ma for her license, registration, and proof of insurance and explained why he stopped her. Amundson smelled a faint but distinct odor of marijuana upon his initial encounter with Defendants at their vehicle.

Amundson determined the van was rented, and asked for the rental agreement. Ma and Luo began conversing in Chinese while looking for the

2

agreement, and Amundson saw a large bundle of cash in the glove compartment when Ma opened it.  Ma told him it was around $2,000.  Amundson asked Ma to come to his patrol car so he could talk to her about the speeding violation.  Almost immediately upon entering the patrol car, Ma told Amundson several times that she believed she had the wrong rental agreement, but he did not respond to her.

As Amundson was writing Ma a speeding ticket in the patrol car, he asked her several questions about where she and Luo were from, where they were going, why they were going to New York, whether they had family there, whether either Defendant was employed, and how long the Defendants had known each other.  Ma told him she was from California and she had rented another vehicle to drive up to the state of Washington, where she was going to help Luo move across country to New York.  She explained that the rental agreement she gave him was the agreement for that previous trip, not the current one.  Ma told Amundson she planned to fly home from New York but had not purchased a ticket yet, and neither she nor Luo had family in New York.

It is unclear from the recording in Amundson's car how long Ma said she had known Luo.  Amundson testified at the hearing that although he wrote in his report that she said three years, upon further review of his recording of the traffic stop she said "not three years."  (Doc. 29.)  Similarly, it is not clear whether Ma

3

was employed at the time, because although Amundson reported both Defendants to be unemployed, Ma said she worked "part-time, all the time" on the recording. (Doc. 29.) It appears the language barrier between Amundson and Ma prevented clear communication on these issues.

Amundson requested an additional officer on scene, and Montana Highway Patrol Trooper Fetterhoff ("Fetterhoff") arrived and began questioning Luo at the passenger side of the minivan. Fetterhoff did not smell marijuana coming from the van, although the windows may have been rolled down for several minutes by that time. Fetterhoff realized Luo spoke little English, and he chose to communicate with her by using an application on his iPhone that translated English phrases into Chinese characters both on his screen and aloud.

About ten minutes after entering the patrol car, Amundson realized he had the wrong rental agreement so he and Ma went back to the van to get the right one. Ma began conversing with Luo in Chinese, and Amundson told her not to speak to Luo and escorted her back to his car. Two minutes later, Amundson and Ma went back to the van to look for the agreement again. When they reached the back of the van, Ma noticed Fetterhoff was holding her purse. Amundson returned to his car and permitted Ma to search for the correct rental agreement while Fetterhoff watched. Ma found it and returned to the patrol car. Fetterhoff then approached

4

Amundson at his driver's side window and handed him a speeding ticket Ma received on June 9, 2012 in Wyoming. Amundson began asking Ma about what she was doing in Wyoming, and Ma said the ticket was "the one in my wallet I think." (Doc. 29 at 24:17.)

Fetterhoff did not mention his discovery of the speeding ticket in his report. At the hearing, he first testified that he did not know what the paper was that he brought to Amundson. Upon review of the video, he recalled that it was the speeding ticket and said Luo must have handed it to him. He said he did not mention it in his report because he thought it was irrelevant. Luo testified that she did not hand anything to Fetterhoff during the stop. Ma testified that the last place she saw the Wyoming speeding ticket was in her wallet inside her purse. Amundson discusses the speeding ticket in his report but does not state how he obtained it. (Doc. 40-1 at 3.)

The rental agreement for the minivan showed it was rented on June 16, 2012 in Everett, Washington and was to be returned on June 22, 2012 in Manhattan, New York. The other rental agreement that Ma initially gave Amundson indicated Ma had been an authorized driver of a minivan rental from Everett, Washington to Manhattan and back one week prior. Amundson returned Ma's license, insurance, and rental agreement, exited the car and explained to Ma how to pay her ticket.

5

As he was explaining payment and the possibility of traffic school, he told Ma she was free to leave. Ma continued to ask him questions about the ticket, and he began questioning her about whether there were illegal drugs in the van. She denied the existence of any drugs, and said she did not know what marijuana was.

Amundson asked Ma if he could search the van and the bags inside it. Ma told him he could search her bags, the blue suitcase and Gucci purse, but he would have to ask Luo to search the other bags because they were hers. Amundson gave Ma a consent to search form to sign, and she told him she did not read English very well. He asked her to read it if she could, and she looked at it for a few seconds while Amundson continued talking to her, and then signed it.

Fetterhoff then asked Luo to search her bags through the iPhone translator by typing in "can he look in your bags" and "the bags in back." (Doc. 55.) Luo appeared to consent, and Amundson told Ma to explain the consent form to Luo, including that she could deny the search, stop it, or limit its scope. The parties dispute Ma's explanation of the consent form to Luo. Defendants' translator says Ma told Luo "[h]e said you can say that you want to search the van on your own. He wants to search the van. They will let you search, he will not search." (Doc. 34-2 at 20-21.) DEA Group Supervisor Luis Burgos reviewed Defendants' translation for the government and said it was too literal. Burgos believes a better

6

translation is "he said you need to say on your own whether you want to search the vehicle." Amundson then pointed to where Luo needed to sign on the form, and she signed it. Amundson opened a duffel bag in the van and found it contained marijuana. Shortly thereafter, a Bozeman City Police drug dog arrived on scene. The dog alerted to the van with the door closed. Fetterhoff asked Luo through the translator if she wanted Amundson to stop looking in the car, and she said no. The total amount of marijuana in the van was 253 pounds. Ma and Luo were arrested, handcuffed, and transported to the Gallatin County Sheriff's office.

DEA Agent Burgos interviewed Ma and Luo in Chinese via telephone after the arrest. Ma invoked her right to an attorney immediately after Burgos read her *Miranda* rights in Chinese. Luo told Burgos that she understood the iPhone translation regarding consent to search and the consent form Ma explained to her. She also said that she did not know what was happening in general, and asked Burgos several times whether she should have a lawyer. No recording was made of the interviews. Defendants have remained in custody since their arrest. They each filed motions to suppress the marijuana on August 31, 2012, and a suppression hearing was held on October 23, 2012.

## II. Suppression of Wyoming Speeding Ticket

The speeding ticket Ma received in Wyoming and any inferences drawn

therefrom will be suppressed under the exclusionary rule. The exclusionary rule is a judicially created rule that "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). Not every Fourth Amendment violation results in exclusion; the doctrine is used as a last resort. *Id.* at 140. The rule applies only where it will result in appreciable deterrence that outweighs the societal cost of possibly letting the guilty go free. *Id.* at 141.

Defendants demonstrated at the hearing that Fetterhoff handed Ma's Wyoming speeding ticket to Amundson during the traffic stop. Fetterhoff does not mention the ticket in his report, and Amundson's report does not explain how he obtained the ticket. Fetterhoff was hesitant when questioned about the ticket at the hearing. The recording shows Fetterhoff with Ma's purse, then he is at the passenger window while Ma and Luo are searching for the rental agreement. It is unclear how Fetterhoff obtained possession of Ma's purse. He could not recall specifically, Luo said she did not hand it to him, and the video recording of the stop does not reveal anything. The only evidence before the Court is that Fetterhoff had Ma's purse, he gave Amundson the ticket a few minutes later, and Ma said the ticket was in her wallet inside her purse. Although Fetterhoff says he did not include the ticket in his report because it was irrelevant, it obviously was important enough to deliver to Amundson during the stop.

8

While the Court cannot definitively conclude that Fetterhoff obtained the speeding ticket via an illegal search of Ma's purse, the evidence leans in that direction. The suspiciousness of his discovery of the ticket combined with his failure to document anything in his report require exclusion of the Wyoming speeding ticket from evidence. It will not be considered in the Court's analysis of consent or probable cause under the automobile exception. Dismissal of the entire case, as Defendants request, is not warranted. The appropriate balance of deterrence versus the societal cost of suppression under the exclusionary rule supports exclusion of the ticket.

### III. Discussion

### A. Standing

The United States argues Ma does not have standing to challenge the search of the van. "A defendant may have a legitimate expectation of privacy in another's car if the defendant is in possession of the car, has the permission of the owner, holds a key to the car, and has the right and ability to exclude others, except the owner, from the car." *United States v. Thomas*, 447 F.3d 1191, 1198 (9th Cir. 2006). Ma has standing to challenge the search of the van because she was an authorized driver of the rental vehicle. *Id.* at 1199.

### B. Consent

The government bears the heavy burden of proving a consent to search was freely and voluntarily given. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997). "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion." *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973). Voluntariness of a consent to search is determined by examination of the totality of the circumstances. *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007).

The following factors are considered in determining voluntariness: (1) whether Defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether Defendant was told that she had a right not to consent; and (5) whether Defendant was told a search warrant could be obtained. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). Several additional factors are considered when a defendant is a foreign national:

> In a case involving a foreign national, the court should assess voluntariness by examining, among other things, whether the defendant signed a written waiver; whether the advice of rights was in the defendant's native language; whether the defendant appeared to understand those rights; whether the defendant had the assistance of a translator; whether the defendant's rights

10

were explained painstakingly; and whether the defendant had experience with the American criminal justice system.

*United States v. Amano*, 229 F.3d 801, 804-805 (9th Cir. 2000).

Defendant Ma only consented to a search of her bags. She did not consent to a search of the large duffel bags that contained the marijuana. She told Amundson the duffel bags belonged to Luo and he would have to ask her to search them. Ma's consent is not at issue because her consent did not extend to the marijuana eventually seized by law enforcement. Luo's consent is what led to the search of the duffel bags, so it is her consent, not Ma's, that must be voluntary.

Applying the voluntariness factors to Luo, it does not appear her consent was voluntary. The first factor of whether she was in custody requires its own analysis. Ma and Luo were both subject to a valid traffic stop which rendered them both temporarily detained but not in custody. *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). Because traffic stops are notoriously dangerous for police officers, the risk of harm for officers and occupants is minimized if the officers take unquestioned command of the stop. *Id.* An officer may order both the driver and the passengers of the vehicle to exit the vehicle during a traffic stop. *Id.* at 331. The significant interest of officer safety outweighs the additional intrusion of exiting the vehicle for both the driver and passengers of a lawfully stopped

vehicle. *Id.* Both the driver and passenger are seized from the moment the car is stopped "until the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Id.* at 332-333. An officer may ask questions unrelated to the stop if the questions do not measurably extend the duration of the stop. *Id.* at 333.

A stop is not unreasonably prolonged when the officer's unrelated questioning leads to the defendant's arrest but the entire encounter takes only eight minutes. *United States v. Mendez*, 476 F.3d 1077 (9th Cir. 2007). Brief pauses to ask unrelated questions are lawful, so long as the length of the stop is not prolonged appreciably or unreasonably under the circumstances of each stop. *United States v. Turvin*, 517 U.S. 1097, 1101-1103 (9th Cir. 2008). In *Turvin*, an officer was informed during Turvin's traffic stop that he had previously been caught with a rolling methamphetamine laboratory in his vehicle. The officer paused during his ticket-writing to ask Turvin about a suspicious box in the vehicle, which led to his arrest for possession of methamphetamine. The entire time from stop to arrest was fourteen minutes. The Ninth Circuit Court of Appeals determined this questioning did not unreasonably prolong the stop. *Id.*

Ma and Luo both assert the lawful stop of their vehicle was unlawfully prolonged by Amundson's questioning of Ma, turning the stop into a custodial

interrogation requiring a reading of Defendants' *Miranda* rights. The government argues the confusion over the rental agreement prolonged the stop, and Amundson was diligently trying to find the rental agreement. Defendant Ma responds that she told Amundson they had the wrong rental agreement almost immediately upon sitting in his vehicle, but he did not listen to her. Defendant Ma is correct. She did tell Amundson she had the wrong rental agreement several times shortly after entering his vehicle, and he did not respond to her. It appears from the video inside Amundson's vehicle that he either did not understand Ma completely or he simply was not listening to her. Many of Amundson's questions after Ma told him she had the wrong rental agreement were not related to the stop or the effort to find the correct rental agreement. Amundson would not allow Ma and Luo to speak to each other in Chinese, and he physically steered Ma back to his vehicle while they were trying to find the correct rental agreement.

The parties also disagree on when the stop ended. The government argues the stop ended after approximately 25 minutes when Amundson gave Ma her papers and told her she was free to leave. Ma responds that Amundson may have told her she was free to leave, but he immediately followed those words with several questions about whether drugs were in the vehicle, making it clear Ma was not free to leave. At the hearing, Amundson testified that he was suspicious that

13

there was marijuana in the vehicle from his initial contact when he smelled it. His suspicion is evidenced by his calling for a canine officer prior to asking for consent and filling out the consent forms while he was writing Ma's speeding ticket.

The stop did not end when Amundson told Ma she was free to leave. First, Amundson maintained a further need to control the scene. He admitted that he suspected Defendants of trafficking illegal drugs, and had already called a canine officer and filled out consent to search forms prior to telling Ma she was free to leave. Second, the circumstances of his statement that Ma was free to leave would not have given a reasonable person the impression that she was actually permitted to drive away from the scene. Immediately after mentioning that she was free to leave, Amundson initiated an extensive series of questions about whether there were illegal drugs in the van. A reasonable person would not have felt free to ignore his questions, get in the van (where Fetterhoff was still questioning Luo), and drive away. The stop was not over at that point.

The stop was measurably prolonged by Amundson's unrelated questioning, but there is no constitutional violation because he had reasonable suspicion to question Ma about the presence of illegal drugs in the vehicle. The length of the stop from when Amundson approached the vehicle until Defendants' arrest was

close to 35 minutes. Although part of this time can be attributed to the language barrier between the Troopers and Defendants, Amundson's actions account for the majority of the delays. If he had listened to Ma when she initially told him multiple times that she had the wrong rental agreement, delay could have been avoided. Similarly, if he had permitted Ma to look for the agreement in the van, or at least ask Luo to find it, delay could have been avoided. Many of his questions were related to his suspicion that Defendants were trafficking drugs. These questions contributed to the overall delay and prolonged the stop beyond the duration of an average traffic stop for speeding. However, as will be discussed further below, Amundson had reasonable suspicion for his expanded questioning about drug trafficking, so Ma's Fourth Amendment rights were not violated. *Mendez*, 476 F.3d at 1080-1081.

Thus, under the voluntariness factor of whether Defendant was in custody, both Defendants were likely in custody once Amundson began questioning Ma about drugs in the van, if not before. Ma was the driver, so Luo's ability to leave the scene depended on Ma. Moreover, Luo was questioned by Fetterhoff for the majority of the stop, so she was not free to leave regardless of Ma's situation. Luo was in custody when she provided her verbal consent to search, and when she signed the consent form.

The remaining voluntariness factors generally favor Defendants. The Troopers did not have their guns drawn at any point during the stop. The Troopers did not inform Defendants of their *Miranda* rights. They were required to do so once Defendants were in custody, but did not do so until their interviews at the station. Ma was not informed verbally that she had the right not to consent prior to her limited consent, although the consent form she signed did so advise. It does not appear that Ma read the consent form prior to signing it, and she said she has difficulty reading English. She had the document for thirteen seconds before she signed it, and Amundson continued talking to her the entire time she held it. Ma's consent is not particularly relevant, however, because her bags did not contain marijuana. Officer Amundson did ask Ma to inform Luo that she had the right not to consent or to limit her consent. It is unclear at best whether Ma relayed this information to Luo. Although Luo said during her interview that she understood the consent to search, she also clarified that she did not understand what was going on in general. The translation of Ma's discussion with Luo about consent does not give the Court confidence that Luo was informed or understood her right to refuse consent. This factor weighs heavily in favor of Defendants. The Troopers never discussed the ability to get a search warrant with Defendants, so this factor helps the government. Overall, the initial voluntariness factors suggest

the consent to search was not voluntary.

### Foreign Nationals

Turning to the voluntariness factors for foreign nationals, it is apparent that Luo's consent was not voluntary. Her signature on the written waiver is next to meaningless because it does not appear she knew what she was signing. Luo was not given the advice of rights in Chinese, or at all, until she was interviewed at the station, so her understanding of her rights then is irrelevant. Luo did not have a live translator present to inform her of her rights regarding consent to search. Fetterhoff attempted to ask for consent with his iPhone translator, but it is unclear whether the translation was accurate or whether Luo knew which bags he was referring to. Ma's explanation also does not clearly demonstrate that Luo was fully and painstakingly informed of her rights in Chinese. Finally, there is no evidence to suggest Luo has prior experience with the American criminal justice system. The analysis for foreign nationals solidifies the Court's opinion that Luo's consent to search the duffel bags in the van was not adequately informed and thus not voluntary.

### C. Automobile Exception

Despite the invalidity of Luo's consent, Defendants' motion must be denied because the search of the van and seizure of the marijuana was permitted under the

automobile exception to the Fourth Amendment search warrant requirement. The automobile exception allows law enforcement to search automobiles and containers found therein without a warrant if they have probable cause to believe the vehicle contains contraband or evidence of criminal activity. *California v. Acevedo*, 500 U.S. 565, 580 (1991). Probable cause to search exists if there is a fair probability evidence of a crime will be found in the place searched based on the totality of the circumstances. *United States v. Cervantes*, 678 F.3d 798, 802 (9th Cir. 2012). This exception exists because of the mobility of vehicles and the ease with which defendants can elude detection in the time required to obtain a search warrant. The analysis is objective–the subjective intent of the officer is irrelevant. *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000).

Defendants sought to impugn Amundson's credibility at the suppression hearing, arguing he lied in his report by stating that Ma brought him the Wyoming ticket attached to the other rental agreement. That is not the case. As the government pointed out, its brief on the suppression motion mistakenly says Ma brought Amundson the Wyoming ticket. Amundson's report does not indicate how he obtained the ticket. (Doc. 40-1 at 3.) There is no evidence that Amundson knew how Fetterhoff obtained the ticket, so Defendants' attempt to malign his credibility fails.

Amundson had probable cause to believe the duffel bags in the van contained marijuana. The following evidence supports probable cause to search:

- the smell of marijuana Amundson detected upon his initial contact at the window of the rental van with Defendants;
- the rear seats had been removed from the van, which Amundson testified is common with drug smugglers so the bags are not visible at eye-level;
- Ma was listed as an authorized driver on a rental van from Washington to Manhattan one week prior, but she told Amundson that rental agreement was for her vehicle from California to Washington;
- Amundson's testimony at the hearing that Washington state is a major west coast source of large amounts of marijuana and New York is one of the largest target markets nationally for marijuana;
- the $2,000 in cash kept in the glove box of the rental van;
- Ma had not bought a plane ticket to return home from New York;
- Neither Ma nor Luo had family in New York; and
- the van did not contain any household items typically found in a cross-country move, just the duffel bags.

While many of these facts indicate no unlawful activity when viewed alone, considering them in their totality there was a fair probability that the duffel bags

contained marijuana. The smell of marijuana, the duffel bags with the seats removed, and the large amount of cash in the glove box alerted Amundson's suspicions from the beginning of the stop. These facts alone probably warranted probable cause for a search. The inconsistencies in Ma's explanations and her destination, as well as her trip one week earlier, confirmed Amundson's suspicions. The automobile exception permits Amundson's warrantless search in this case. Defendants' motion to suppress must therefore be denied.

In accordance with the foregoing, IT IS HEREBY ORDERED:

1. Defendant Ma's motion to suppress (doc. 32) is DENIED.
2. Defendant Luo's motion to suppress (doc. 39) is DENIED.

Dated this 1st day of November 2012.

_____
Dana L. Christensen, District Judge
United States District Court